IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NORRIS PEGUES,

              Plaintiff,

v.

KARL HOFFMANN, L. DOBBERT, and
CANDACE WARNER,

              Defendants.

OPINION and ORDER

22-cv-352-jdp

---

    Norris Pegues, an inmate at New Lisbon Correctional Institution (NLCI), suffers from paraplegia, which makes him susceptible to pressure sores. Pegues contends that healthcare providers at NLCI denied his requests for a thicker medical mattress, which led to serious pressure sores. I allowed Pegues to proceed on Eighth Amendment medical care and Wisconsin-law medical negligence claims against defendants Dr. Karl Hoffmann, Lynn Dobbert, and Candace Warner.

    Defendants move for summary judgment. Dkt. 37. Pegues's paraplegia and his vulnerability to pressure sores are serious medical needs, but defendants did not ignore Pegues's pressure sore problems. Pegues did not receive a medical mattress for most of his time at NLCI, even though he had been provided an extra mattress at his previous institution. But an inmate is not entitled to the treatment of his choice, and the evidence shows that defendants provided extensive treatment for Pegues's medical issues, including his pressure sore problems.

    I will grant summary judgment on Pegues's Eighth Amendment claims, and I will relinquish jurisdiction over the state-law medical negligence claims.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Pegues's paraplegia causes weakness in his legs and decreased sensation in his legs, groin, and buttocks. He can stand briefly and move short distances with a walker.

Pegues transferred from the Wisconsin Secure Program Facility (WSPF) to NLCI in January 2016. Defendant Candace Warner, the health services unit manager at NLCI, coordinated Pegues's intake to NLCI. Warner was aware from a social worker at WSPF of Pegues's medical restrictions at WSPF, which included an extra mattress, as well as a walker and a wheelchair. Warner asked that these items be sent along with Pegues to NLCI. No extra mattress was sent to NLCI.

While at NLCI, Pegues was regularly seen and treated for numerous health problems. Dkt. 68 ¶¶ 44–56. For purposes of this case, I focus on the treatment of his pressure sores.

About three months into his stay at NLCI, in April 2016, Pegues submitted a health services request (HSR) asking for a thick mattress to prevent pressure sores. Dkt. 46 at 14. Defendant Lynn Dobbert, a nurse at NLCI, responded that the HSU didn't provide thick mattresses and told him to raise the matter with his unit manager who could measure his mattress and replace it if necessary. Pegues did not report suffering from pressure sores at the time.

A little more than a year later, July 17, 2017, Pegues submitted another HSR asking for a medical mattress to prevent bedsores. Dkt. 46 at 16. Dobbert responded that they didn't have special mattresses and that he would have to get up, move around, and change positions in bed to prevent bedsores. Pegues did not report suffering from pressure sores at the time.

Soon after, July 24, 2017, Pegues was seen in the HSU for an open pressure sore on his buttocks. Pegues was issued two extra pillows, and NLCI nurses treated the wound over several days. Defendant Dr. Karl Hoffmann, a doctor at NLCI, saw Pegues four days after the sore was reported. Hoffmann put Pegues on a care plan, which included advising Pegues to stay off his buttocks to allow for normal blood flow to the area of the sore. Dr. Hoffmann and nurses continued to care for Pegues, and the wound closed in about a month. Pegues says that he asked Dr. Hoffmann for a medical mattress these appointments. (Hoffmann denies this, but for purposes of summary judgment, I'll accept Pegues's version.)

On August 1, 2017, Pegues filed a grievance complaining about Dobbert's response to his July 17 request for a thicker mattress. Dkt. 51 at 11. The institution complaint examiner recommended dismissing the grievance after speaking with Warner, who said that the HSU didn't provide special mattresses. *Id.* at 2. At the next level of appeal, the reviewing authority, Holly Gunderson, a nurse and wound care specialist with the DOC, dismissed the grievance with modification. *Id.* at 4. Gunderson clarified that medical mattresses were available if a physician determines that the medical mattress was medically necessary. *Id.*

About two years later, in July 2019, Pegues was seen in the HSU for sores on his buttocks and a swollen left ankle. Pegues was sent to the emergency room, and then spent seven days in a medical center where he was treated for infected pressure sores on his buttocks and ankle swelling. Dkt. 54-1 at 40, 47, 52–53. After his discharge, Pegues was sent to the infirmary at Dodge Correctional Institution (DCI) for wound care. The DCI infirmary is the only hospital-like setting in the DOC system and it can offer specialized wound care and hospital beds.

Pegues returned to NLCI almost a year later, in May 2020. Pegues was placed at first in the NLCI infirmary for two weeks, and HSU staff confirmed that he would require a medical mattress when he was released to a handicap cell on the C-unit. *See* Dkt. 54-1 at 56–58. For reasons that are unclear, a medical mattress was not available at NLCI. HSU staff arranged for Pegues to be moved back to the NLCI infirmary until a medical mattress arrived at NLCI. *Id*. at 57. Gunderson regularly went to NLCI to provide wound care for Pegues and she consulted with Dr. Hoffmann.

In early June 2020, Pegues's pressure sores worsened. He was treated in the NLCI infirmary for about a week. Ultimately, after consulting with Dr. Hoffmann and Roslyn Huneke, HSU supervisor at NLCI, Gunderson decided to return Pegues to the DCI infirmary because his wound had been successfully treated there. Pegues was transferred to the DCI infirmary on June 10, 2020.

Pegues returned to NLCI in about five months, on November 9, 2020. His medical mattress arrived with him. But soon his wound was deteriorating, and Dr. Hoffmann didn't feel that it could be managed at NLCI. So, on November 18, 2020, Pegues returned to the DCI infirmary.

About five months later, in April 2021, Pegues had surgery to repair his wound at the University of Wisconsin Hospital. Dk. 54-1 at 22. After his discharge, he went to Select Specialty Hospital to continue his recovery. Dkt. 54-1 at 4, 22. Pegues returned to the DCI infirmary after being discharged from the specialty hospital. Dkt. 46 at 59; Dkt. 54-1 at 4.

I will discuss additional facts as they become relevant to the analysis.

4

ANALYSIS

A. Eighth Amendment medical care claim

1. Eighth Amendment standards

The Eighth Amendment prohibits prison officials from consciously disregarding the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish an Eighth Amendment medical care claim, Pegues must show that he had an objectively serious medical condition that the defendants consciously disregarded. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). Pegues's paraplegia and his susceptibility to pressure sores are serious medical needs. The issue in this case is whether any defendants consciously disregarded Pegues's pressure sore problems.

A defendant consciously disregards an excessive risk to prisoner health if the defendant is aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the defendant must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Even gross negligence is not enough to establish conscious disregard. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996).

The Eighth Amendment doesn't entitle a prisoner to demand specific treatment or to "the best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). A medical professional who provides some treatment nevertheless consciously disregards a prisoner's serious medical need if his response is so inadequate that it demonstrates an absence of professional judgment.

5

*See Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). A prisoner satisfies this standard by showing that the medical professional persists in a course of treatment he knows is ineffective, choses an easier and less effective treatment without exercising professional judgment, or provides blatantly inappropriate treatment likely to seriously worsen his condition. *See Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

Pegues must also show defendants' medical care, or lack of it, actually injured him. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020); *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019).

## 2. Warner

Pegues alleges that Warner knew that he needed a medical mattress but didn't provide one. And, according to Pegues, she told nursing staff that he shouldn't receive one.

The fundamental problem with Pegues's claim against Warner is that, regardless of her views about NLCI policy on thick mattresses, there is no evidence that she disregarded Pegues's pressure sore problems. In anticipation of Pegues's transfer to NLCI, she reviewed his medical restrictions and asked staff at WSPF to send his extra mattress. *See* Dkt. 43 ¶¶ 18–19; Dkt. 68 ¶¶ 19–20. Pegues didn't receive an extra mattress, but there's no evidence that Warner actually knew that. Nor is there any evidence that she knew of Pegues's later requests for a thicker mattress because those requests were handled by Dobbert, even though Pegues attempted to submit one of those requests to Warner's attention.

The failure to provide Pegues with the extra mattress when he arrived at NLCI was contrary to DOC policy. DOC Health and Services Policy and Procedure 300:07 provides that

6

"[a]ll medical restrictions/special needs orders shall remain in place upon [a prisoner's] transfer until the medical record is reviewed. Dkt. 47 at 4. So Pegues's extra mattress should have been provided until his medical review. But, Warner didn't do Pegues's intake; another nurse, Felber, did. A case under 42 U.S.C. § 1983 depends on personal involvement, so Felber's violation of the policy can't be imputed to Warner. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). In any case, a "violation of a jail policy is not a constitutional violation enforceable under . . . § 1983." *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

I infer that Warner learned of Pegues's request for a medical mattress after he filed a grievance in August 2017. *See* Dkt. 51 at 2. But by this point, Pegues's pressure sores were being treated by Dr. Hoffmann and others. Warner would have been entitled to rely on Dr. Hoffmann's treatment decisions at that point, and her lack of intervention then could not cause any harm to Pegues. *See Pulera*, 966 F.3d at 553.

Pegues also contends that Warner was enforcing an unconstitutional policy to deny thick mattresses to inmates. It's undisputed that Warner believed that thick mattresses or extra mattresses were prohibited by NLCI policy. *See* Dkt. 43 ¶¶ 18–19; Dkt. 68 ¶¶ 19–20; *see also* Dkt. 43 ¶ 33; Dkt. 51-1 at 2; Dkt. 54 ¶ 49. But Warner's attempt to comply with what she thought was NLCI policy does not demonstrate her conscious disregard of Pegues's medical needs. At worst it demonstrates a lack of diligence or a lack of competence with DOC regulations. But these failures would amount to negligence, not the conscious disregard of a medical need necessary to support an Eighth Amendment claim. And the record as a whole demonstrates that NLCI medical staff did not disregard Pegues's vulnerability to pressure sores. The staff advised him how to avoid them, they provided extra pillows, and they promptly treated the sores when Pegues suffered from them.

I will grant summary judgment on Pegues's Eighth Amendment claim against Warner.

3.  **Dobbert**

Pegues alleges that Dobbert responded to his requests for a medical mattress by telling him that NLCI didn't have such mattresses and that he'd need to move around to prevent bedsores.

Dobbert, like Warner, mistakenly believed that NLCI policy prevented the HSU from providing thick mattresses or extra mattresses to prisoners. But again, this does not show a conscious disregard of Pegues's medical needs.

Pegues submitted two HSRs asking for a thicker mattress to prevent pressure sores, and Dobbert responded to them both. Neither response demonstrates a disregard of Pegues's vulnerability to pressure sores. In response to the April 2016 HSR, Dkt. 46 at 14, Dobbert suggested to Pegues that he ask his unit manager to measure his mattress to see if it needed replacing. *Id.* Pegues did not suggest that he was currently suffering from pressure sores. Similarly, in response to the July 2017 HSR, Dkt. 46 at 16, Dobbert suggested that he get up, move around, and change positions in bed to prevent bedsores. *Id.* Dobbert's advice is consistent with the advice of other providers. *See, e.g.,* Dkt. 45 ¶ 67; Dkt. 57 ¶ 99. Her response does not suggest that Dobbert believed that the failure to provide Pegues with a thicker mattress would lead to pressure sores. Again, Pegues did not suggest in the HSR that he was actually suffering from pressure sores at the time. The record shows that any time Pegues reported symptoms of a pressure sore, or any other health problem, Dobbert and the rest of the HSU staff responded promptly and provided treatment.

I will grant summary judgment on Pegues's Eighth Amendment claim against Dobbert.

### 4. Dr. Hoffmann

Pegues alleges that he repeatedly told Dr. Hoffmann that he needed a thicker mattress but Dr. Hoffmann refused the requests or ignored them outright. Pegues contends that he made these requests over the two-year course of treatment starting in the summer of 2017, after he developed a pressure sore at NLCI. Dr. Hoffmann doesn't recall Pegues asking him for a medical mattress, Dkt. 45 ¶ 73, but for purposes of summary judgment I accept Pegues's version of the facts.

A prisoner is not entitled to demand specific treatment. *Arnett*, 658 F.3d at 754. It isn't enough for Pegues to show that Dr. Hoffmann failed to give him a medical mattress; he needs to present evidence showing that Dr. Hoffmann consciously disregarded his pressure sore problem. Pegues fails to make this showing. The evidence shows that Dr. Hoffmann provided extensive treatment for a variety of medical issues. Dkt. 68 ¶¶ 44–56. Dr. Hoffmann also treated Pegues's pressure sores and referred him to other facilities when treatment at NLCI was ineffective. Viewing the record of the case as a whole, no reasonable jury could find that Dr. Hoffmann consciously disregarded Pegues's suffering from pressure sores or any of his medical problems. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (courts must consider the "totality" of a prisoner's medical care when deciding whether it shows conscious disregard of medical needs).

The court will also look more specifically at Dr. Hoffman's treatment related to the medical mattress issue.

Dr. Hoffmann says that he doesn't believe that Pegues needed a medical mattress in 2017 (when his pressure sores first appeared at NLCI) because his pressure sores were caused by sitting on his buttocks for too long, not by his mattress. Dkt. 45 ¶¶ 37, 73. But in 2017,

9

Dr. Hoffmann repeatedly recorded Pegues's pressure sore as a "sacral decubitus ulcer," Dkt. 45, ¶ 35, which means a pressure sore in the area of the sacrum. The sacrum, the bone across the back of the pelvis, is an area of pressure while lying down. *Id*. ¶ 36. Dr. Hoffmann now says his records were incorrect, and that his records also say the location of the sore was to the right of the gluteal cleft. According to Dr. Hoffmann, this suggests a sore lower on the buttocks that would have been caused by sitting. *Id*. ¶ 37. Although Pegues does not have any expert evidence to refute Dr. Hoffmann, a jury would not have to believe Dr. Hoffmann's after-the-fact correction of the medical record. Dr. Hoffmann recorded the sore as a sacral pressure sore. A reasonable jury could choose to believe that, which would suggest that Pegues's standard prison mattress contributed to the sore.

But ultimately the dispute about the location of the 2017 pressure sore is immaterial, because Dr. Hoffmann did not ignore it. Dr. Hoffmann and the HSU staff diligently treated the pressure sore and the sore got better in about a month. Although Pegues wasn't issued a medical mattress, he was issued two extra pillows to help alleviate pressure while he was lying down. Pegues didn't get what he asked for, but his susceptibility to pressure sores wasn't ignored.

The location of the 2019 pressure sore isn't genuinely disputed: it was in the ischial area, Dkt. 54-1 at 40, which is at the bottom of the pelvis, where one sits. For the 2019 sore, Dr. Hoffmann's explanation that it was likely caused by sitting is unrefuted. And it is undisputed the Dr. Hoffmann and the nurses at NLCI consistently advised Pegues to avoid sitting for extended periods. Again, regardless of the location and cause of the sore, it was not ignored. Pegues received extensive treatment, and Dr. Hoffmann and the HSU staff referred Pegues for off-site treatment when treatment at NLCI was ineffective. And, during much of

this treatment while at NLCI, Pegues was either kept in the NLCI infirmary or provided with a medical mattress in his handicap-accessible cell. And when it was discovered that NLCI didn't have a medical mattress, Pegues was returned to the infirmary until one arrived.

Pegues challenges other aspects of Dr. Hoffmann's treatment, contending that he performed incomplete examinations, failed to keep adequate records, failed to advise him about the dangers of friction and shear, and discontinued his vitamin C prescription. Dkt. 53 at 10. I will not consider these challenges, because they are outside the scope of the claim on which I allowed Pegues to proceed: that Dr. Hoffmann violated his Eighth Amendment rights by refusing or outright ignoring Pegues's requests for a medical mattress. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). In any case, these other challenges would not have much traction, given the extensive care that Pegues received from Dr. Hoffmann and the other medical staff at NLCI.

### 5. Conclusion

Pegues's paraplegia poses a host of medical challenges, and he had been provided an extra mattress at WSPF. So his requests for a medical mattress at NLCI are understandable, as is his frustration at being left to sleep on a standard three-inch prison mattress. Judged with the benefit of hindsight, it would have been better to have provided Pegues with a thicker mattress, to alleviate whatever risk of pressure sores that a standard prison mattress might pose. But Pegues has failed to adduce evidence that any of the defendants consciously disregarded his pressure sores or his susceptibility to them. Accordingly, I must grant summary judgment to defendants on Pegues's Eighth Amendment claim.

### B. State-law medical negligence claim

Because I will grant summary judgment on Pegues's Eighth Amendment claims, the recommended practice would be to relinquish jurisdiction over his state-law medical negligence claims. Dkt. 38 at 28. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). Pegues hasn't shown that this court could exercise federal diversity jurisdiction over his medical negligence claims; he fails to allege that he and defendants are citizens of different states and nothing in the record suggests that they are.

Pegues may pursue those claims in state court, subject to Wisconsin statutes of limitations. Those limitations periods have been tolled while this case has been pending, but they will begin again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

### ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 37, is GRANTED. Plaintiff's Eighth Amendment claims are DISMISSED with prejudice.

2. Plaintiff's medical negligence claims are DISMISSED because I decline to exercise supplement jurisdiction.

3. The clerk of court is directed to recaption Karl Hoffman as Karl Hoffmann, and Candance Warner as Candace Warner.

4. The clerk of court is directed to enter judgment and to send plaintiff copies of this order and the judgment.

Entered February 9, 2024.

                                BY THE COURT:

                                /s/

                                _____
                                JAMES D. PETERSON
                                District Judge